IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ALBERT J. HAUCK, JR.,**

      Plaintiff,

  v.                                        Civil Action 2:16-cv-970
                                              Judge Michael H. Watson
                                              Magistrate Judge Jolson

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Albert J. Hauck, Jr., filed this action under 42 U.S.C. § 405(g) seeking review of a decision of the Commissioner of Social Security (the "Commissioner") denying his application for a period of disability and disability insurance benefits. For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

### I. FACTUAL AND MEDICAL BACKGROUND

The Complaint in this case was filed on October 31, 2016 (Doc. 4), and the Commissioner filed the administrative record on February 15, 2017 (Doc. 8). Plaintiff, who is proceeding *pro se*, filed a Statement of Specific Errors on April 7, 2017 (Doc. 12), the Commissioner responded on May 23, 2017 (Doc. 13), and Plaintiff filed a Reply Brief on June 19, 2017 (Doc. 14).

#### A. Personal Background

Plaintiff was born on July 12, 1963 (Tr. 212, PAGEID #: 272), and alleged a disability onset of December 30, 2008, which he later amended to January 5, 2010 (Tr. 58–59, PAGEID #:

114–15; Tr. 178, PAGEID #: 237). He has a high school education (Tr. 45, PAGEID #: 10), work experience installing drywall (Tr. 47, PAGEID #: 68), and was last insured on March 31, 2011 (Tr. 179, PAGEID #: 239).

**B. Relevant Hearing Testimony**

Administrative Law Judge Edmond Giorgione (the "ALJ") held a hearing on April 6, 2015. (Tr. 37, PAGEID #: 93). During the hearing, Plaintiff testified that his most severe problems are in his neck and lower back, which is causing problems in his hips. (Tr. 48, PAGEID #: 104). Although Plaintiff had neck surgery in 2010, it did not alleviate his pain which is "[o]nly progressively getting worse." (Tr. 53–54, 58, PAGEID #: 109–110, 114). Plaintiff stated that he is in constant pain and unable to "lift too much of anything…." (Tr. 49, PAGEID #: 105). He indicated that, at times, his pain causes him to act grouchy and irritable toward his wife and others. (Tr. 49–50, PAGEID #: 105–106). Plaintiff takes a muscle relaxer, blood pressure medicine, and diabetes medicine. (Tr. 52, PAGEID #: 108).

Plaintiff fears doctors based on a 1998 incident. (Tr. 56, PAGEID #: 112). He explained, "[i]n 1998 I went into the hospital to get an appendix removed. Well, somehow my spleen ended up getting ruptured and I was sent home bleeding to death. And ever since that time I have had trouble with doctors." (*Id.*). He indicated that because of that incident and because his neck surgery failed to alleviate his pain, he is reluctant to take his doctor's recommendation that he have knee surgery to address the "bone on bone" in his knee. (*Id.*).

Plaintiff testified that he has trouble walking and falls on occasion. (Tr. 48, PAGEID #: 104). He watches television, occasionally goes to the grocery store, dresses himself, cares for his personal hygiene, drives, and cuts the lawn with a riding mower. (Tr. 49–51, 53, PAGEID #: 105–107, 109). Plaintiff stated that his wife takes care of the flowers. (Tr. 51, PAGEID # 107).

2

Plaintiff stated he's been a beer drinker his "whole life." (Tr. 51, PAGEID #: 107). He testified that "[s]ome days, [he]'ll drink 12 beers, some days [he]'ll drink 2 beers, some days [he]'ll drink 20 beers." (Tr. 51, PAGEID #: 107). However, he does not feel that this drinking has interfered with his life. (Tr. 51–52, PAGEID #: 107–108).

Vocational Expert Michael Klein (the "VE") also testified at the hearing. (Tr. 59, PAGEID #: 115). The VE testified that an individual with Plaintiff's residual functional capacity ("RFC") could not perform Plaintiff's past relevant work. (Tr. 61, PAGEID #: 117). However, the VE opined that, considering the ALJ's restrictions, light jobs would be available in the relevant region, such as small product assembler and labeler, market retail. (*Id.*). In contrast, the VE testified that there would be no competitive work available if the individual had a sedentary profile, was unable to focus on the job for ten minutes out of every hour, or missed two or more days of work per month for medical reasons. (Tr. 62, PAGEID #: 118).

### C. Relevant Medical Evidence

Plaintiff's surgeon Dr. Carolyn S. Neltner examined Plaintiff on February 8, 2010, "one month status post an anterior cervical discectomy with fixation and fusion at C5-6 and C6-7." (Tr. 382, PAGEID #: 444). Plaintiff expressed having some numbness and pain but, "[a]ll in all," he reported feeling "okay.'" (*Id.*). Upon physical examination, Dr. Neltner noted that Plaintiff's voice was strong and clear, his incision was "healing nicely," and he had "a good range of motion to his neck." (*Id.*). She observed that Plaintiff was hypertensive but indicated that Plaintiff's primary physician was making medication changes to get his blood pressure better controlled. (*Id.*). In the assessment and plan, Dr. Neltner stated that Plaintiff was doing "fairly well" and advised him "to gradually increase his activities as tolerated." (*Id.*). She also planned to review films to examine Plaintiff's allograft and hardware. (Tr. 383, PAGEID #:

445).

At a return visit on March 22, 2010, Dr. Neltner determined that Plaintiff's post-operative data revealed stable alignment and positioning of the allograft and hardware and a normal EMG and nerve conduction velocity study. (Tr. 378, PAGEID #: 440). She suggested that Plaintiff take Aleve if necessary, or Tylenol if he required analgesics. (Tr. 379, PAGEID #: 441). Dr. Neltner further "release[d] Mr. Hauck from active followup." (*Id*.).

On August 30, 2010, Dr. Neltner examined Plaintiff based on his complaints of headaches and posterior cervical pain. (Tr. 517, PAGEID #: 579). Upon review of cervical spine films, Dr. Neltner concluded there was "stable positioning and alignment of [Plaintiff's] graft and hardware at C5-6 and C6-7." (*Id*.). She stated that Plaintiff was "describing pain that [she] thought could potentially be related to sinus disease;" hence, she ordered a CT of his sinuses. (*Id*.). Based on the report, Dr. Neltner "suggested that perhaps [Plaintiff] should meet with an otolaryngologist for further evaluation and possible treatment." (*Id*.).

Dr. Neltner likewise suggested Plaintiff consider taking an over-the-counter anti-inflammatory medication and physical therapy. (*Id*.). However, she noted that "Mr. Hauck is not interested in pursuing physical therapy at this time." (Tr. 517–18, PAGEID #: 579–80). Finally, Dr. Neltner stated that she was "not planning on seeing Mr. Hauck back in active follow up at this juncture." (Tr. 518, PAGEID #: 580).

Plaintiff pursued a psychiatric evaluation by Dr. Avneet Hira on August 4, 2010. (Tr. 397, PAGEID #: 459). Plaintiff described his chief complaint as follows: "I have been an alcoholic for the past 30 years and have not had any alcohol in the last 28 days." (*Id*.). Further, in the "social history" section of Plaintiff's psychiatric evaluation report, Dr. Hira noted that Plaintiff's "hobbies include playing pool and golf." (Tr. 398, PAGEID #: 460). Dr. Hira

4

described Plaintiff's mood as "anxious" and his affect as "slightly nervous." (*Id.*). Dr. Hira stated that Plaintiff was cooperative, had normal speech and coherent thought processes, and no abnormal movements. (*Id.*).

Plaintiff takes medication for diabetes (Tr. 357, PAGEID #: 419), hypertension (Tr. 363, PAGEID #: 425), and generalized anxiety disorder (Tr. 397, PAGEID #: 159). Nevertheless, the state agency reviewers who examined the evidence related to Plaintiff's conditions determined that Plaintiff was not disabled. (Tr. 65–75, PAGEID #: 122–32; Tr. 77–89, PAGEID #: 134–46).

### D. Relevant Portions of the ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on March 31, 2011, and he did not engage in substantial gainful activity during the period from his original onset date of December 30, 2008 through his date last insured of March 31, 2011. (Tr. 22, PAGEID #: 78). He concluded that Plaintiff had numerous severe impairments, consisting of degenerative disc disease of the cervical, thoracic, and lumbar spine, diabetes mellitus, and hypertension. (*Id.*). The ALJ also found that, through the date last insured, none of Plaintiff's impairments or combination of impairments met or equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 24, PAGEID #: 80).

The ALJ further determined that, through the date last insured, Plaintiff had the residual functional capacity to:

> perform light work as defined in 20 CFR 404.1567(b) except: lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for 6 hours in an 8 hour workday; sit 6 hours in an 8 hour workday; pushing/pulling limited per lift/carry exertional levels; frequent climbing of ramps or stairs; frequent stooping; occasional crawling; no climbing of ladders, ropes or scaffolds; and occasional reaching with the right upper extremity.

(*Id.*). He also determined that Plaintiff was unable to perform any past relevant work through the

date last insured and "was 47 years old, which is defined as a younger individual age 18–49," on the date last insured. (Tr. 28, PAGEID #: 84).

The ALJ noted Plaintiff's high school education and ability to speak English. (*Id*.). He found that transferability of job skills was not material to the disability determination because "using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not he has transferable job skills." (*Id*.). Ultimately, the ALJ determined that, "[t]hrough the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed." (*Id*.). Thus, he found that Plaintiff was not under a disability as defined in the Social Security Act at any time from the alleged onset date of December 30, 2008 through March 31, 2011. (*Id*.).

## II.  LEGAL STANDARD

Under 42 U.S.C. § 405(g), "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To that end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff filed an atypical Statement of Errors that centers primarily on his assertion that his impairments are severe enough to have warranted a favorable decision. (*See generally* Doc. 12). Although Plaintiff's Statement of Errors is not entirely clear, the Court will construe it liberally to claim that the ALJ's decision is unsupported by substantial evidence. *See Works ex rel. A.R.W. v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 690, 697 (S.D. Ohio 2012).

### A. Plaintiff's Date Last Insured

A claimant must have sufficient quarters of coverage to be entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1)(A), (c)(1); *see also* 20 C.F.R. § 404.10(a) ("Whether you have the required insured status depends on the number of quarters of coverage (QCs) you have acquired."). A claimant's insured status may expire, *see* 20 C.F.R. § 404.130(b), and the claimant is only entitled to disability benefits if he is able to show that he was "under a disability" within the meaning of the Social Security Act by his date last insured, 20 C.F.R. §§ 404.131(a), 404.320(b)(2); *see Kingery v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 598, 602 (S.D. Ohio 2015) (citing *Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir. 1984)).

Plaintiff struggles to understand this concept and conflates what he alleges should have been his onset date (a fall in the driveway in 2009) with his date last insured. (Doc. 14 at 3, PAGEID #: 817) ("I do not understand what it means when it is said by S.S.D. that my last insured date was March 2011, if I fell in the driveway in 2009."). Stated simply, Plaintiff questions how he could have paid into social security if he could not work. (*Id*.). The short answer is that Plaintiff's earning records reflected that his coverage continued for a time after he stopped working.

Here, the ALJ found that Plaintiff's earning records demonstrated that he had acquired

7

sufficient quarters of coverage to remain insured through March 31, 2011. (Tr. 22, PAGEID #: 78). Plaintiff's counsel cited the same date at the hearing before the ALJ. (Tr. 40, PAGEID #: 96) (noting that Plaintiff's date last insured was March 31, 2011). Hence, Plaintiff had the burden of proving that he was disabled under the Social Security Act by that date. *Kingery*, 142 F. Supp. 3d at 602.

How Plaintiff can do so warrants additional discussion. Plaintiff's Statement of Errors claims generally that the ALJ erred in failing to address certain documents, many of which were created after March 31, 2011, his date last insured. These documents include a medical record from Dr. Steven Priano dated 10/18/2013 (Ex. 28F); medical records from Dr. Todd Hamilton dated 12/20/2013–12/23/2013 (Ex. 14F); a "Dr. Report" from Steven Severyn dated 6/17/14; a medical record dated 9/9/2014 (Ex. 16F); medical records of Riverside Methodist Hospital dated 10/8/2014 (Ex. 18F); a medical record of OhioHealth Neurological Physicians dated 12/10/2014–12/15/2014 (Ex. 19F); and a report from Dr. Devol dated 7/5/16. (*Id.* at 4–7). Plaintiff likewise cites residual functional capacity questionnaires dated October 22, 2013 (Ex. 33F) and December 23, 2013 (Ex. 15F). (*Id.* at 9).

However, "the ALJ generally only considers evidence from the alleged disability onset date through the date last insured." *Lowery v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 700, 716 (S.D. Ohio 2012). Although consideration of evidence obtained after the date last insured is not prohibited, such evidence is only relevant to the extent that it "relate[s] back to the claimant's condition prior to the expiration of [his] date last insured." *Kingery*, 142 F. Supp. 3d at 602. Thus, to the extent that the ALJ failed to give weight to evidence because "it did not relate back to the claimant's functioning prior to his date last insured," his decision was not in error. (Tr. 27, PAGEID #: 83 (giving little weight to the opinions of Dr. Priano and Mr. Hamilton because they

8

did not relate back)).

### B. The ALJ's Evaluation of the Medical Evidence

As an initial matter, the Court notes that the ALJ's decision overlooks Plaintiff's amended onset date. Specifically, the ALJ evaluated the period from December 30, 2008 (Plaintiff's original onset date) to March 31, 2011 (the date last insured), but should have evaluated the period from January 5, 2010 (the amended onset date) to March 31, 2011 (the date last insured). (Tr. 29, PAGEID #: 85). However, as Defendant argues, the error was harmless because the ALJ considered the entirety of the relevant period. (*See* Doc. 13 at 3, n. 3, PAGEID #: 806).

In analyzing the relevant medical evidence, the ALJ noted Plaintiff's surgeon, Dr. Neltner, found Plaintiff to be doing "fairly well" following his neck surgery and advised him "to gradually increase his activities as tolerated." (Tr. 25, PAGEID #: 81 (citing Tr. 382, PAGEID #: 382—February 8, 2010 appointment)). The ALJ likewise noted Dr. Neltner's review of post-operative data revealed stable alignment and positioning of the allograft and hardware and normal EMG and nerve conduction velocity study. (*Id.* (citing Tr. 378, PAGEID #: 440—March 22, 2010 appointment)). These determinations, the ALJ observed, led Dr. Neltner to "release Mr. Hauck from active follow up." (*Id.*).

Although the ALJ noted Plaintiff's subsequent visit to Dr. Neltner in August 2010 due to headaches and posterior cervical pain, he cited Dr. Neltner's ultimate conclusion that stable alignment and positioning of the allograft and hardware remained. (Tr. 26, PAGEID #: 83 (*see* Tr. 517, PAGEID #: 579)). The ALJ also cited Dr. Neltner's opinion that Plaintiff's complaints could be attributable to his sinuses, statement that Plaintiff was "not interested in pursuing physical therapy at this time," and indication that she was "not planning on seeing Mr. Hauck

back in active follow up at this juncture." (*Id.*). The ALJ further discussed imaging of Plaintiff's lumbar and thoracic spine in February 2010 and physical examination findings which he considered supportive of a conclusion that Plaintiff is capable of performing light work. (Tr. 26, PAGEID #: 82). As for Plaintiff's diabetes and hypertension, the ALJ cited evidence showing that Plaintiff's conditions were controlled by medication prior to the expiration of his date last insured. (*Id.*).

Turning to Plaintiff's mental impairments, the ALJ examined Plaintiff's psychiatric evaluation by Dr. Hira on August 4, 2010. (Tr. 26, PAGEID #: 82). The ALJ discussed Dr. Hira's notations that Plaintiff self-reported alcoholism for thirty years (but was alcohol free for twenty-eight days prior to the evaluation) and his mood was anxious and slightly nervous. (*Id.*; *see* Tr. 397–98, PAGEID #: 159–60). The ALJ cited Dr. Hira's findings that Plaintiff was "cooperative with normal speech, coherent thought processes and no abnormal movements." (Tr. 27, PAGEID #: 83). The ALJ observed that, although Plaintiff's family physician had prescribed him Celexa, "[t]here is no indication that the claimant sought mental health counseling or psychiatric treatment prior to his date last insured." (*Id.*; *see also id.* (adding that Plaintiff was evaluated for psychosis in the emergency room in August 2010, but "the attending psychiatrist was unable to find any psychiatric symptoms that he found distressing and concluded that the claimant's complaint were organic in nature instead of psychiatric")). Finally, the ALJ assigned great weight to the state agency psychological consultants who opined that Plaintiff did not have a severe mental impairment. (*Id.*).

Plaintiff claims that the ALJ's analysis of the medical evidence is deficient. At base, Plaintiff insists that his conditions are severe enough to warrant disability (*see generally* Docs. 12, 14) and asserts that his physicians aren't telling the whole story (*see, e.g.*, Doc. 12 at 5 ("I did

not reject physical therapy. My neck hurts so bad I do not want anyone to touch it")). Those assertions alone do not fairly detract from the weight of the decision. *See Rhodes*, 2015 WL 4881574, at *2; *see also Patrick v. Comm'r of Soc. Sec.*, No. 2:14-cv-2346, 2016 WL 67522, at *2 (S.D. Ohio Jan. 6, 2016) (quoting *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")). Further, Plaintiff's apparent belief that the ALJ was obligated to discuss each exhibit (*see, e.g.*, *id*. at 4 "I cannot find any comments or facts … on this exhibit") is inconsistent with the relevant law. *See, e.g., Sito v. Comm'r of Soc. Sec.*, 229 F. Supp. 3d 633, 644 (N.D. Ohio 2017) ("As the Sixth Circuit observed in *Simons v. Barnhart*, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (internal footnotes omitted).

Based on the foregoing, the ALJ reasonably relied on the relevant medical evidence in concluding that Plaintiff is capable of performing light work. To the extent that Plaintiff cites any evidence prior to his date last insured, he fails to explain how it reflects any limitation unaccounted for by the ALJ.

**C. Additional Argument**

Plaintiff also complains that he has requested but has not received a "voice recording" of his April 6, 2015 hearing before the ALJ. (Doc. 12 at 10, PAGEID #: 781). Plaintiff explains that he is requesting the recording because he "would like to hear [his] voice saying:"

A. Pg. 15-51 of Transcript
I assumed yard work meant mowing lawn. I also said my wife has a flower garden she takes care of it. I mow lawn with a riding mower. Used to do it in 1½ hours. Now it takes me 3 to 7 days.

B. Exhibit 11F Pg. 2

> It has been suggested I made a comment that I play golf in the Decision Jurisdiction and Procedural History, when in fact, if I made any comment about golf it would have been, I used to like to play golf. If I in fact was asked if I play golf, I would have said I have not played golf since before 2008. I would not. Could not move my head, neck, back or hips in that motion since before 2008. This upsets me because I used to love to play golf. In fact I loved to work hard and play hard.

(*Id.*; *see also id.* at 9, PAGEID #: 780 ("I did not say I played golf. I did not say I do gardening."); Doc. 14 at 5–6, PAGEID #: 819–20 (noting that he played golf prior to his injury)). Plaintiff's request is based on his belief that the ALJ erred in his consideration of Plaintiff's activities of daily living. (Doc. 13 at 8, PAGEID #: 811).

The hearing testimony concerning "yard or garden work" is as follows:

> Q. Do you do any yard or garden work?
>
> A. Yes, sir. I try to—I live in the middle of the woods. It used to take me about an hour and a half to cut my lawn, now it takes me two or three days. My son helps me a little bit with that. That's pretty much all the yard work I do. My wife does flowers and stuff out there.

(Tr. 51, PAGEID #: 107). Further, in the "social history" section of Plaintiff's psychiatric evaluation report, Dr. Hira noted that Plaintiff's "hobbies include playing pool and golf." (Tr. 398, PAGEID #: 460).

In determining that Plaintiff has a "mild limitation" in his activities of daily living, the ALJ found:

> The claimant is independent in his activities of daily living as he resides with his wife and two children. The claimant testified that he is able to do household chores such as cleaning, yard work, and gardening slowly. The claimant also testified that he is able to drive, grocery shop with his wife and attend to his personal grooming. Lastly, the claimant reportedly engages in hobbies such as playing pool and golf.

(Tr. 23, PAGEID #: 79). Defendant admits that "the ALJ did mistakenly note that Plaintiff did some gardening," but argues that the ALJ "reasonably considered that Plaintiff did some yard

work and acknowledged that it was done 'slowly.'" (Doc. 13 at 9, PAGEID #: 812). Defendant further argues it was reasonable for the ALJ to consider Dr. Hira's report and "[t]here is no indication that Plaintiff was unable to do these hobbies after 2008, as Plaintiff now claims, from the medical record." (*Id.*).

Here, the ALJ found Plaintiff had just a mild limitation in daily living, given that he retained the ability to, *inter alia*, drive, clean, shop, and take care of his personal grooming. (*See* Tr. 23, PAGEID #: 79). Even assuming the ALJ improperly found that Plaintiff could "garden[ ] slowly" and play golf, this Court has no reason to believe that the ALJ would have reached a different result absent those considerations. Thus, any error is harmless and does not constitute an adequate reason to remand. *See Webb v. Comm'r of Soc. Sec.*, 2016 WL 791453, at *7, n.3 (N.D. Ohio Jan. 26, 2016) (citing *Keeton v. Comm'r of Soc. Sec.*, 583 Fed. App'x 515, 524 (6th Cir. 2014) ("finding it appropriate to affirm an ALJ's decision based on mistakes where mistakes constituted harmless error and the 'agency would have made the same ultimate finding with the erroneous finding removed from the picture.'") (citations omitted)); *see also Shkabari v. Gonzalez*, 427 F.3d 324, 328 (6th Cir. 2005) ("[N]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") (citation omitted)).

## IV. CONCLUSION

Based on the foregoing, the Court finds that the ALJ acted within his "zone of choice" in concluding that Plaintiff is not disabled within the meaning of the Social Security Act. *See Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). Because the ALJ's decision is supported by substantial evidence, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.

Date: August 2, 2017  /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE